May it please the court, Irek Hamidullin was a Taliban foot soldier who was captured by the United States military in Afghanistan in 2009. He was convicted and sentenced to two years in jail. He was also convicted of murder. I therefore ask that the U.S. military forces in combat in violation of the fundamental principle that soldiers are not criminals and they are not subject to prosecution by their enemies for conduct that does not constitute a violation of the laws of war. This principle is reflected in the joint military regulation AR190-8 in the Geneva Conventions and in the Common Law. Regulation 190-8 makes three things clear. First, if someone engages in a belligerent act in an armed conflict and is seized by the U.S. military and they claim POW status, a competent tribunal must determine that status. Second, until a competent tribunal determines their status, the person must be treated as a prisoner of war. Third, prisoners of war are immune from domestic criminal liability for conduct that does not violate the laws of war. The government makes three primary arguments in response. First, they argue that AR190-8 is not enforceable. This is contrary to the view of the D.C. Circuit in Al-Warafi v. Obama, in which that court said that the regulation is domestic binding law. It is also contrary to Supreme Court precedent, which the Supreme Court, including in the United States v. Nixon, where they have said that the executive remains bound by its duly issued regulations. Well, what makes you think that the regulation supersedes a provision in the U.S. Criminal Code? I wouldn't say that it supersedes it. I would say that it is a... But you just did. I would say that it is binding and provides an immunity. It is akin... as Judge Ellis did in trying the criminal case. I would suggest that the law provides, the binding regulation says, that until a competent tribunal determines status, Mr. Hamadolin is immune from criminal prosecution. It is akin, as we've said, to the statutory provisions which preclude prosecution of juveniles unless they've been... Why does the status need to be determined a priori? There's a combatant immunity defense that can be raised in these trials. It's an affirmative defense being brought before the district court, and the status determined at that point. But here, when you read the shooting at American aircraft, it's a violation of criminal law. And are we risking something by allowing regulations of all sorts to supersede and essentially trump the operation of that criminal code? I would say two things. First, we agree that there is a separate common law defense that can be asserted at trial. But first, this is an immunity. It is akin to, for example, diplomatic immunity. There is a case that we've cited in the supplemental briefing, United States v. Al-Hamdi, which is a diplomatic immunity case. Similarly, in that case, the defendant was charged with violating the criminal law. However, there is a treaty which says that individuals who are diplomats are immune from the jurisdiction of the domestic criminal law. Well, what we seem to be hung up on from the last argument is the issue of what is a competent tribunal. Well, at the time that the Geneva Convention was drafted, initially, the word military tribunal was in there. But when it was adopted, it was removed, and it just said a competent tribunal. So going to Judge Wilkinson's question, why isn't a federal district court, in the first instance, a competent tribunal? Because in the first instance, a competent tribunal is defined by the regulation to be three military officers. But Mr. Bush issued, you're talking about primary jurisdiction type thing, he issued a letter saying how they were supposed to be treated. There's no reason to give the The two responses to that are, first, the leader of a country can't determine that the other side is not entitled to POW status. So imagine, for example, we were engaged in a conflict with North Korea, and Kim Jong-un decided that none of the American soldiers would be entitled. I'm not suggesting that. I'm just suggesting that the Army regulation doesn't bind an Article 3 court. And if you argue that it should be first reviewed by the Army, I would say the reference issue has been decided by the Commander-in-Chief. I would suggest that it provides a prerequisite to prosecution in the same way, for example, in the Al-Hamdi case, where this court You're saying 190 does bind the Article 3 court, that the tribunal is a predicate to a POW. That's correct. That is, before the person has been determined by a competent tribunal not to be a POW, they must be treated as such, and they are immune from domestic criminal liability. Do you know, is this record clear on whether there was ever a Article 3 tribunal designated or convened? Article 5 tribunal? Article 5 tribunal. I saw Article 3, I'm talking about the convention or something. Anyway. Article 5 tribunal, whatever you want to call it, a tribunal, a 190 tribunal. There has not been one that has been convened for Mr. Hamidullah. Is the record clear on that? We have repeatedly said that there is no evidence of it, and the government has never said that one... Right, but we don't know what happened. Do we know why he was transferred from Army custody, or what authority he was transferred from Army custody to civilian custody? No. And that's not in the record? It is not. And if he were a POW, it would be precluded for him to be transferred from Afghanistan to civilian custody. That is a right that's given in the Geneva Conventions. But back to the question of a competent tribunal... Well, we had a determination, or a pronouncement, whatever it was called, in 2002 by the President that the Geneva Convention applies, but Taliban fighters, or whatever they were called in it, are not entitled to POW status. Correct. There was something like that in 2002. Presumably, that's how they ended up with a bunch of people at Guantanamo. When you say something like... So they did transfer a bunch of the captured persons from Afghanistan to Guantanamo Bay in Cuba. And that pronouncement, was it ever changed or vacated? No, and so... Then when this guy was captured in 2009, maybe he was supposed to go to Guantanamo. And they decided they weren't going to use Guantanamo anymore, so they brought him to Richmond. Perhaps. Anyway, he ended up in Richmond. That's correct. And let me back up. You asked if the record is clear about whether there's ever been an Article V Tribunal. Because of that 2002, February 7, pronouncement by the President, I don't think there's ever been an Article V Tribunal for any detainee from Afghanistan. And so that's why there are authorities afterwards... The detainees of the Taliban in Afghanistan were never accorded Article V Tribunals. I think that's right. And so one of the authorities that we cite is the former second highest lawyer in the army, who said that that was opposed unanimously by army lawyers at every level of command. From a jurisdictional standpoint, when Congress passes a criminal law and provides a criminal punishment, it's by that act, the passage of a criminal statute, that Congress confers on a federal court jurisdiction. Absolutely. And it doesn't need to be any kind of pre-hearings, this or that. If you bring charges under a duly passed criminal statute, then the Article III court at least possesses jurisdiction. Agree. We agree completely. That's, you're talking about subject matter jurisdiction, and we are making no claim that the district court lacked subject matter jurisdiction. We have been very careful... What is your claim? I thought that was part of your claim. No, we make no claim that the district court lacked subject matter jurisdiction. The supplemental briefing order from this court asked whether, asked the parties to consider whether the district court had jurisdiction in the first instance to decide that this man was not a POW. We've been very careful with the word jurisdiction. We say it is an immunity, because that is essentially what the case law has provided. There is an analogy to diplomatic immunity, in which cases talk about that as a jurisdictional immunity from criminal law. I think they're sort of, they're talking about a, it is language from the Vienna Convention on Diplomatic Immunity. They're talking about a personal jurisdiction. If the district court has jurisdiction, it has jurisdiction to determine all the matters that are ancillary to the criminal prosecution. And one of those ancillary matters is whether there's a combatant immunity defense. And the difficulty that I have with your argument on this point is that by 2009, a lot changed between 2001 and 2009. And by 2009, Haqqani and the Taliban seemed to be more in the nature of a bunch of marauders. And they didn't really enjoy the status of a nation state. They weren't broadly recognized as a nation state. And to elevate, we would be talking about every terrorist group in the Middle East, you know, in Yemen and in Saudi Arabia and in Syria and whatever. And we'd be elevating them to the status of nation states and giving them the protections of the Geneva Convention. And that's an extraordinary step to take. And we'd be doing it, as far as I understand, in contravention to the views of all of our allies in this struggle. So we'd be setting up friction there. And we would be doing it in contravention of what the president of the United States has determined, which is that these are, that they should, that this is not, that these are not, Taliban fighters are not lawful combatants. And so we're trying to abrogate the president's authority. And it seems to me we're trying to abrogate Congress's authority. And we're trying to move in contradistinction to our allies in this struggle, set up all kinds of conflicts there. Because none of our, none of those countries that are fighting with us, that were fighting with us in 2009, they would have been surprised to know that they were fighting another nation in an international armed conflict. Let me say four things, starting with the last. First, Congress has the power under the Constitution to prescribe rules relating to captures overseas. They have delegated authority to the president in a statute, 10 U.S.C. 121, to make rules regarding the military. And the executive branch has done so. So both Congress and the president have enacted their own regulations to describe the authority of the military in this context. This is not against what they have said. It is based on the words that they use. The second point is that district courts don't always have the power to decide everything in a criminal case. In a diplomatic immunity case, they are bound by the certification from the State Department. That's what Al-Hamdi says. In a juvenile case, they are bound to decide as a jurisdictional matter whether the attorney general has certified an individual to be prosecuted as an adult. The district court in this case is similarly bound and cannot apply criminal, domestic criminal laws to someone who is presumptively a POW. The third point, and this is a major point that the government makes, and that is by 2009, this was not an international armed conflict. And that's their critical point. The point we make... Whether it's an armed conflict or a non-international armed conflict, whatever the terms are, is a separate issue from POW issue. Well, I would say two things. Well, the tribunal wouldn't decide the armed conflict issue. That's correct. That'd be decided by the president or someone in the executive branch. I would say, actually, Article III courts, yourselves, are actually responsible to decide the nature of the conflict. That's what the Supreme Court did in Hamdan against the government's characterization of the conflict with al-Qaeda. But when it comes to the issue of whether there is an international armed conflict or a non-international armed conflict, we agree that individuals in a non-international armed conflict under international law are not entitled to POW status. However, the regulation itself does not distinguish between detainees who were seized in an international armed conflict and a non-international armed conflict. It says that anyone who was seized by the U.S. military in an armed conflict, having committed a belligerent act, is entitled to be treated as a POW if they so assert that status. And let me give you an example of how that plays out in practice. So you're talking about AR-190-A. Correct. And JAG officers, and we've cited this in our briefs, JAG officers are taught to teach their commanders that every detainee, regardless of the nature of the conflict, must be treated as a POW presumptively until their status is determined. One of the basic problems I have with your argument is I just don't understand how you manage to endow this army regulation with all this status. I mean, to me, this brings up the whole question of whether there's civilian control over the military. And to say that an army regulation overrides the authority of an Article III court and the designation of the president and the jurisdiction that Congress has conferred on an Article III court, and to say, no, there's this army regulation out there which supersedes all of these things, it just seems to me we're giving military regulations a status and a position in this country that is superior to civilian control. And that's what our whole system rests on. There are two sources of authority for the regulation. The first is the Geneva Conventions, which is, it is... The first is what? The Geneva Conventions and the third Geneva Convention, which it is designed to implement. And second, it is implemented by virtue of the constitutional authority given to Congress to regulate rules regarding captures, which it is told that... I understand, but the question is, what is the scope of the Geneva Convention? And there's no reason that an Article III court can't apply that. It applies international law all the time. There's nothing about the Geneva Convention that puts it in a situation where an Article III court can interpret it and apply it and determine what its scope is. And in this case, Judge Ellis indicated that this Haqqani group didn't have any of the kind of characteristics and features that the Geneva Convention set forth for POW protection. I mean, they don't abide by the laws of war themselves. They go ahead killing civilians. They engage in sort of suicide bombings. They don't wear uniforms, as far as I can tell. They don't have insignia. There's no formal command structure. None of the things in Article IV of the Geneva Convention that marks someone as a POW entitled to immunity from prosecution, none of these characteristics do these people possess. May I respond? I'm over my time. Sure, no, go ahead. This was decided by Judge Hudson 15 years ago. Judge Ellis decided in another case whether an individual had POW status. But speaking of 15 years ago, when we were before Your Honor in the Hamdi case, one of the major issues was whether the Geneva Convention has force as binding law. That was critical in that case. And here we have pointed out that the Geneva Conventions have force as binding law under AR-190-8. We don't disagree with that. I don't disagree with it. Somebody else might. But I feel fine. It's binding law. The question is, is the district court stripped? Just because it's binding law, is the district court stripped of its authority to apply it? And that, it's that second step that I don't get. If I may respond, in the same way that a district court is bound if an individual is a diplomat or an individual has not been certified who's a juvenile for adult prosecution, the district court has no power to go forward with a prosecution under domestic law. All right, thank you. Mr. Palmer. Mr. Palmer, tell me why an Article III court can't be a competent tribunal under the Geneva Convention to make the determination as to whether somebody's a POW or not. Your Honor, we agree that the Article III court can serve that function. And more to the point, Your Honor, the requirement of a competent tribunal applies only in international armed conflicts. And the government's court... Has any court ever ruled that, that an Article III court is a competent tribunal under AR-190? Did the district court rule on that question, Your Honor? No, has any court? Yes, Your Honor. The D.C. Circuit in the Hamdan case rejected this same argument and found that the President's determination could satisfy the requirement of a competent authority for purposes of the Army regulation. And that makes sense, Your Honor, because the purpose of the tribunal is to determine the legal status of the detainee by mid-level military officers. And if the executive branch at the highest levels has already determined as a categorical matter that it's a non-international armed conflict and that the particular group is a non-state actor that doesn't satisfy the requirements for prisoner of war status, then there's no purpose in having such a tribunal. There's no doubt for purposes of the Geneva Convention. Why would anyone want to sign on to the Geneva Convention if every little terrorist band was going to be accorded the status of a formal state actor? Well, that's correct, Your Honor. States have been careful to circumscribe authorization to commit acts of war to other states. And that's why the protections of prisoner of war status apply only in international armed conflicts. And by 2009, the Taliban and the Haqqani Network were non-state groups. And the conflict between the United States and those groups was classified properly as a non-international armed conflict. Who classified it as a non-international armed conflict in 2009? The executive branch has classified it that way. When? I'm sorry, Your Honor. When? I think since the Hamdan case in the Supreme Court, in which the Supreme Court clarified that the definition of the distinction between international armed conflicts and non-international armed conflicts turned on, not on the geographic scope of the conflict, but on the status of the parties. And once that premise is established... When did it... When was it determined? Well... You all cite the 2016 report from the president. Correct. And previous to that, you cite the 2002 pronouncement from the president. And we're talking about 2009. Was there anything in between those two? Your Honor, I'm not aware of a kind of formal pronouncement by the government in between those periods. But it's implicit in the way that the United States has carried out the conflict since that time that it has never treated since 2001 and 2002, when the Taliban were replaced by a new government that was recognized by the United States, recognized by the UN Security Council, recognized by the United States' allies as the only legitimate government of Afghanistan. Since that time, the United States has always treated the Taliban and the county network as non-state actors. And that... How many other countries recognize the Taliban as a state actor? Well, none do, Your Honor. There were only three of the countries ever recognize the Taliban. And those three countries removed that recognition shortly after the September 11, 2001 attacks. And since that time, no state has recognized the Taliban. Do these fighters in 2009, do they even wear uniforms? They don't, Your Honor. As the district court found... Do they have insignia? They don't, Your Honor. Again, as the district court found. There was evidence here that these... This fellow and his group did that at that particular battle at Khost Province. Well, it's true that there was testimony that showed that they... That they, in some ways, looked different from typical civilians. I don't know that that evidence showed that they had a uniform or a fixed distinctive sign within the meaning of the Geneva Conventions. But more importantly from... Is that the conduct of the particular defendant on the particular day is not the proper area of focus. The question is whether the Taliban overall... How many international... How many countries were involved in international forces in Afghanistan in 2009? I don't know a precise number, Your Honor, but many countries. There was 44, I think I read somewhere in this. Does that sound about right? That sounds right to me, Your Honor. I don't know, but it's certainly more than a few dozen. So many countries. But that doesn't make the... Is it correct that there's never been any tribunals convened under AR-190 with respect to captives in Afghanistan? That's right, Your Honor. In this sense, tribunals that are empowered to grant POW status have not been convened because the executive branch has determined at the highest levels that no fighters on behalf of the Taliban can be afforded such status. There is a process... When did they determine that? You're talking about 2002? Correct. But do you all have taken different positions in your four briefs here with respect to that point? That was the position you took at first, I think. But you've bounced around a little bit. So is that the position of the government today? That it was determined in 2002 in President Bush's pronouncement? Yes. Ever since 2002, it has been the position of the executive branch that fighters on behalf of the Taliban are not eligible categorically for prisoner of war status. I don't think that's ever changed. Well, the whole reason we fought the war in Afghanistan was to defrock the Taliban from its status as a presumed or de facto government of Afghanistan. That was the whole reason... One of the reasons we fought was to shred them of any semblance of state authority. That's one of the reasons we went in there. I think that's correct, Your Honor. I thought we were after Al-Qaeda. Well, I think both of those are true. We were after bin Laden because of 9-11. Yes, the conflict has been against both Al-Qaeda and the Taliban. But it's important, I think, to recognize that the non-state status of the Taliban is not just the unilateral position of the United States government, although it is, and that that's a position that is properly afforded deference. It's also the position of the United States' allies, of the International Committee for the Red Cross, of the United Kingdom Supreme Court. And, Your Honor, if I could come back to the regulation. The process that is afforded to detainees in Afghanistan, there is a process for detainees who can test factually whether they are, in fact, combatants. But what isn't available is a tribunal that is empowered as a matter of law to grant prisoner of war status. And that makes sense because the executive branch has already determined categorically that the Taliban and Haqqani Network are non-state actors, and so their fighters aren't. Well, whether they're a combatant or not is one of the things that the, I mean, that's one of the things that the criminal prosecution is designed to prove. Because if they're not a combatant, they're not going to be convicted of these, of the charges. They are a combatant, they are. But the point you're trying to make, as I understand it, is that there does not need to be, a priori, a status determination before the criminal justice process can even begin. But that it's open to the district court at any time to say, this defendant has proved his combatant immunity status. He's a member of a state actor and an international force, and as a result, I'm dismissing this case. Because the defendant is entitled to the protections of Article 5, and satisfies the criterion of Article 4. Now, that is not the case here, I hasten to add. But that's the way I understand the sequence, that you can at least commence the criminal prosecution. And if in the course of the criminal prosecution, a district judge feels that an individual satisfies the criteria of Article 4, and is thereby entitled to a protection of Article 5, that prosecution can be dismissed. But it doesn't, but as I understand your position, we don't do this a priori at the outset. Yes, we agree with that, Your Honor. We've never disputed that if the defendant could establish in district court his eligibility for prisoner of war status under the standards of the New Jersey Conventions, that that would provide a defense to the charges. I mean, there could be a determination before the criminal prosecution, as someone, the government could decide, this is a state conflict, this is someone who is a combatant in an international armed conflict. And in that case, the government would never initiate the prosecution. Because they would say, no, this individual is entitled to the protections of the Geneva Convention. We're not going to go forward. But here, there was nothing like that. There was no reason to believe that this person was entitled to the protections of Article 5. And so the government did go forward. But even then, it's subject to the check of the district court. So there'd be many instances in which the government would move against somebody because they're entitled to the protections of Section 5. And even where it does move against somebody, there is still the combatant immunity defense that must be resolved by an Article 3 court. So we're not just chucking the protections of the Geneva Convention overboard. The executive branch has to make a determination as to whether to go forward with the prosecution. And the district and the judicial branch has to make a determination as to whether the combatant immunity defense applies. Did the executive branch ever make such a determination? As to this fellow specifically? Well, other than the determination to bring this case, Your Honor, but there... No, but we haven't contended that... But you're relying on 2002, if I understand it, the 2002 statement of the President. Yes. But those captives, after that then, they were taken to Guantanamo and not to civilian courts. You were using military tribunals. We're going to use military tribunals. And then when this fellow came along in 2009, for some reason, and it's not in this record that I found, he was transferred from military custody to civilian custody. It ended up in Virginia. Is that in this record somewhere? Anything that documents the decision of the executive branch that led to him being in Virginia? No, I don't think that there's any explanation of that decision in the record, Your Honor, but... Is there any explanation of that decision available that you could put in the record? I don't know that there is, Your Honor, but let me... I know that I was in the military a couple of times, and they're prone to write things down and keep records of what goes on. There ought to be something that shows how this fellow ended up, who was captured in Coast Province up there by the U.S. military, ended up in Richmond, Virginia in a courtroom. Went from the custody of the U.S. Army in Afghanistan to the custody of the U.S. Marshal in Richmond. What happened? Your Honor, again, I don't know that the record... And we got this 190 that says if you capture somebody, you're supposed to figure out whether they're a prisoner of war or not. And you say, well, we don't do it individually. I think that's what you're saying. We don't have to do it individually. We can do it as a group. And we have decided that anybody that's connected with the Taliban is entitled to POW status. Yes. So you must have done something that decided that that was enough to get him to the custody of the Marshal in Virginia. Yes, Your Honor. The implication of the government's position that members of the Taliban categorically are not entitled to prisoner of war status is that they are subject to criminal prosecution, whether that takes place in the United States or any court that has jurisdiction. And so the defendant is similarly situated in that sense with all detainees in the conflict. And in fact, the United States, together with the Afghan government, has established criminal courts... But section 190 says, talks about an individual, a person, captured person, correct? It doesn't talk about a group. It talks about a captured person, right? Correct. And the Supreme Court has said that the regulations of the United States Army are the law of the land. Multiple times. Multiple times. Back as far as the 1840s, you got the Supreme Court at least twice talking about Army regulations being the law of the land. Right? I mean, so we've got a regulation 190 here, but this fellow is a captured person, and he wasn't given a tribunal. That we don't know he was given... We don't have any record of him being given a tribunal or anybody ruling that he didn't... Wasn't a B-double quartered. We don't have any record about him individually. And he was a captured person under that section 190. That's what troubles me. Well, so, Your Honor, again, the district court can serve that function. And having a tribunal convened for the purpose of... The district court can serve that function, but the regulation says that until that determination is made, he's to be treated as a POW, individually. He's to be treated as a POW. And some way or another, he was not treated as a POW. He was treated as a criminal defendant, like an arrestee, and came to Virginia and was indicted. I give you all that. You got an indictment here and you're prosecuted. But how did he get here? We don't know. It's not in the record. You don't have anything to offer. I don't, Your Honor, except to say that his legal position is the same, categorically, as all Taliban detainees. There is a process in place for... So you say that name, the individual person, captured person in 190, doesn't mean anything. It can be a group of guerrillas or whatever you want to call them. It's not captured person. So you've amended 190 of the regulations in order to justify your position here. I wouldn't say we've amended them, but to say that they don't apply in non-international armed conflicts, and they don't apply when... But you don't have a determination that it's a non-international conflict until 2016. He had to be in an armed conflict in 2002, and then you had a second determination by the executive branch in 2016. That's what you cite in your briefs, anyway. 2016. Yes. I'll agree with that. I mean, President Obama said it's a non-international conflict in 2016. We're talking about what? 2009. Unless the court... Can you say the courts do have authority, you say, have authority to make that determination for you, but... They do, and so does the President, Your Honor. And so the President can serve as the competent authority that can determine that these are non-state actors who are, by definition, not eligible for prisoner of war status. He did that in 2016. He also did that in 2002. In 2002. But, all right, but in 2000... He said they were not entitled to POW status in 2002. Correct. Then you transferred them to Guantanamo Bay. Well, I don't think that it... Yes, once the determination... Why did this guy go to Guantanamo Bay? We agree that he could be detainable under the law of war. But also, because the President has determined that Taliban detainees are not eligible for prisoner of war status, he is also properly and lawfully subject to criminal prosecution for his insurgent activity. And that has been the consistent position of the President throughout. And so there's no... There would be no purpose in having a tribunal of mid-level military officers to revisit the legal determination that the executive branch has already made at the highest level. It was a determination that there was no purpose of having... Well, mid-level, you say, mid-level military... Field-grade military officers. I always looked at them as... I had to look up in the air to see them. I agree with that, Your Honor, as a former enlisted man. But the point is that the President has determined and that the Taliban are not eligible for this status. And that has been the consistent determination throughout the conflict. And because of that, the President can serve as the competent authority for purposes of this regulation and remove any doubt as to the legal status. And to the extent that... When did the President do that? Beginning in 2002, Your Honor. So the 2002 declaration was still in effect in 2009? Yes. And it said it was an armed conflict? Yes, we've never disputed that there is an armed conflict and that there has been one. And it was still in effect in 2009? Yes, the position... The government has never wavered in its determination that the Taliban are not eligible for prisoner of war status from 2002. Well, even if there was a violation of 198, it strikes me to be a harmless error because the Article III Court afforded this defendant considerably more protections and due process than he would have gotten in front of a three-member military tribunal. I agree with that, Your Honor. With all the protections of Article III Court, the military tribunal doesn't include a right to counsel or an independent adjudicator or an appeal. And the prosecution in district court with appeal to this court afforded greater protections. Let me make sure that I understand your view here as I understand what it is. That you can't allow this Army Regulation 190-8 to... A status determination. There's no obligation under law to allow a status determination under that regulation to override the President's determination of the status of the Taliban and to bring to a halt a criminal prosecution under a duly enacted law of Congress. That, as I keep coming back, it just seems odd to me that an Army Regulation would control over a duly passed criminal law and over a President's determination that the Taliban were not... that they were a non-state actor after 2002 and certainly at 2009. And we would be doing this if... in contravention of the views of all of the allies who are fighting this war with us, which is that the Taliban does not enjoy the kind of status that would enable the Geneva Convention to apply. And so the consequences of allowing that are not just chaotic and confused in the short run and they set different parts of the government against each other, but they also have international repercussions. In terms not only of our allies, but in terms of conferring Geneva status upon every rogue band of terrorists anywhere around the globe. That's how far this potentially... this thing potentially extends, that we would be on the road to conferring formal state status upon terrorist bands, which is what Haqqani was in 2009. It was a terrorist band operating on the Afghan-Pakistani border. It wasn't a state actor, not by any manner of means. And so, you know, if I'm misapprehending your position, you know, correct me, but that's what it seems to me is at stake in this case. Now, we agree with that, Your Honor, and that the defendant's position would call into question the ability of the government to apply a consistent legal framework to the armed conflict that it remains engaged in today. The president could say one thing, the president could determine one thing, and then you'd have mid-level army officers saying, no, that's not correct. And, you know, again, it all comes back to the need for civilian control over the military. The military doesn't operate independently of civilian control in this country. Just doesn't happen. We agree with that, Your Honor, and also that once the case is brought in district court, that the district court is empowered to make that determination. There are no further questions. Mr. Cameron, is there some time for rebuttal? Four points, Your Honor. First, the Bush administration in 2002 characterized the conflict in Afghanistan as international in scope and stated that the provisions of the Geneva Conventions would apply to our present conflict. It then made a categorical determination that the Taliban soldiers would not qualify as POWs, but that categorical determination has been uniformly rejected by individuals who understand the Geneva Conventions. In the district court, Hayes Parks, the government's expert, agreed that that was the executive position from 2002 until 2015 when we had the hearing. He disagreed with it, but he said that was the executive position. Second point, we believe that 190-8 defines a competent tribunal. But even if, for example, Judge Floyd, if you believe that the district court can serve as a competent tribunal, that is not what this district court did. It didn't purport to make an individual determination of Mr. Hamadullin's status. And its conclusions about, in rejecting our motion to dismiss, were based on the categorical determination that the Taliban- Well, I'm not sure why a categorical determination is incorrect on this kind of- I mean, it would seem an odd circumstance to say, well, this member A of the Taliban is entitled to combatant immunity, and member B of the Taliban is not. I mean, we could have determinations on this stuff that were all over the map. That's right. And that's what the law provides. For example, if one group of troops are not wearing distinguishing uniforms or something like that- Why does it provide for that? It can be either- Because the determination- The Taliban is either a state actor with the status of a state, or it's not. It's not chameleon-like. They are absolutely entitled to the entitlements of a state actor if they are a government in exile. That is why we keep pointing to the Free French. And the government makes, in their last submission, a response and says, well, the Free French were fighting in conjunction with the British, but that was expressly rejected by the drafters of the Geneva Convention. It's on page 63 and 64 of the commentary, which we both cited, and it says, it is of little consequence whether or not another state is engaged in the same struggle as these regular armed forces. The authors of the convention deliberately dropped the requirement that such armed forces should be fighting in conjunction with the state. But you talk about the laws of war. This group is not following the laws of war. There's no reciprocity involved here. There was no allegation that these- They're targeting civilians? These individuals were not. They're launching suicide attacks? So did the Japanese. The Nazis engaged in the Holocaust. It did not mean that their soldiers were not entitled to prisoner of war status. The violations of the laws of war by others in that organization or the state actor do not adhere to the individuals. If they're state actors. And this is a government in exile. Everybody can recognize that. A government in exile. That holds 30% of the territory in Afghanistan. Where does the Geneva Convention mention government in exile? In Article 4A3. There are certain criteria set out in Article 4A3. And the district court indicated that these folks did not meet them. 4A3 doesn't specify the 4A2 criteria. The commentary says the provision naturally covers armed forces which continue operations under the orders of a government in exile. It is absolutely clear that this individual is a soldier. When your honor says that this is very odd. That the military should be subject to. They have to be subject to civilian control. The court has to recall that this is a soldier who was fighting in an armed conflict. America's longest armed conflict. Soldiers typically are not subject to domestic criminal prosecution under the law of their enemy. Did they treat one of our soldiers as a prisoner of war recently? There was a lot of publicity about that. With Officer Bergdahl who was recently court-martialed here. He was held. I'm not sure he was given POW status. But similarly, the North Vietnamese or the Koreans in that conflict didn't give our soldiers POW protections. But this country has always adhered to our obligations under the Geneva Conventions. All right, thank you all. Thank you both very much. We'll come down to the council. Moving to our next case.
judges: J. Harvie Wilkinson III, Robert B. King, Henry F. Floyd